TRINA A. HIGGINS, United States Attorney (7349)
TRAVIS K. ELDER, Assistant United States Attorney (11987)
Attorneys for the United States of America
111 South Main Street, Suite 1800
Salt Lake City, Utah 84111
(801) 524-5682
travis.elder@usdoj.gov

UNITED STATES DISTRICT COURT

DISTRICT OF UTAH

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>REAL PROPERTY LOCATED AT 464 WINCHESTER DRIVE, STANSBURY PARK, UTAH,<br><br>Defendant in Rem. | **VERIFIED COMPLAINT FOR FORFEITURE *IN REM***<br><br>Case No.<br><br>Judge |

The United States of America alleges this *in rem* complaint for forfeiture, pursuant to Supplemental Rule G(2) of the Federal Rules of Civil Procedure, against a real property located at 464 Winchester Drive, Stansbury Park, Tooele County, Utah, on the grounds that it is property derived from proceeds traceable to Wire Fraud in violation of 18 U.S.C. § 1343.

**NATURE OF THE ACTION**

1. This civil forfeiture action arises from the fraudulent acts of Preston Carr. From 2014 until 2019, Carr stole infant formula and CPAP masks from his employer, Intermountain Healthcare (IHC), and sold them online to buyers outside of Utah. As a result of his fraud scheme, Carr obtained $1,449,275.63 in cash proceeds. Because Carr used criminal proceeds to

pay the mortgage on his residence, it is real property derived from proceeds traceable to Wire Fraud in violation of 18 U.S.C. § 1343, and subject to forfeiture under 18 U.S.C. § 981(a)(l)(C).

## JURISDICTION AND VENUE

1. This Court has subject matter jurisdiction over this case under 28 U.S.C. §§ 1345 and 1355(a), and in rem jurisdiction is proper under 28 U.S.C. § 1355(b).

2. Venue in this Court is proper under 28 U.S.C. § 1355(b)(1)(A) and 18 U.S.C. § 981(h), because acts or omissions giving rise to the forfeiture occurred in the District of Utah.

## PARTIES

3. The plaintiff is the United States of America.

4. The defendant is real property located at 464 Winchester Drive, Stansbury Park, Tooele County, Utah ("Defendant Property"), legally described as:

> LOT 530 COUNTRY CROSSING NEIGHBORHOOD PHASE 2B PLAT 5 PUD. A PLANNED UNIT DEVELOPMENT OF TOOELE COUNTY OUT OF 14-2-2B5 FOR 2006 YEAR. Parcel Number: 15-060-0530

5. Defendant Property is not seized and no authorization to seize is currently being sought by the United States.

6. In addition to filing of this complaint for forfeiture, pursuant to 18 U.S.C. §§ 985(c)(1), the United States will:

   a. post notice of the action and a copy of the Complaint on Defendant Property; and

   b. serve notice of this action and copy of this complaint on the current property owner of Defendant Property. If the current property owner is not immediately ascertainable, the United States will provide notice to the personal representative appointed or authorized by a court with authority over the handling and settling of the

estate of the owner of record, Preston Carr, who is recently deceased, or if there is no personal representative, then to his known next of kin.

7. The United States will record a notice of lis pendens with the Tooele County Recorder pursuant to UTAH CODE ANN. § 78B-6-1303 to provide notice of the pendency of this action to all persons.

## FACTS

### *Investigation of Preston Carr*

8. On November 6, 2019, a supervisor at IHC's Homecare and Hospice warehouse filed a report with South Jordan Police Department (SJPD). The supervisor stated that a warehouse employee, Preston Carr, was caught stealing large shipments of medical supplies from its inventory by shipping them out from the warehouse to "places all over the country without authorization."

9. Carr worked at IHC's warehouse in South Jordan, Utah, from 2003 until being fired on October 7, 2019, for the unauthorized medical-supply shipments.

10. On August 3, 2021, a SJPD investigator met with IHC representatives including managers[1] and co-workers who worked with Carr. Investigators learned that Carr's job responsibilities at IHC involved maintaining its warehouse inventory and processing factory returns of overstocked inventory.

11. The managers and co-workers alleged that Carr ordered a much larger amount of merchandise than was requested and then shipped the overage to an unknown recipient. IHC

---

[1] SJPD reports use the terms 'supervisor' and 'manager' interchangeably.

provided the investigators with records of sales orders and shipment tracking information for merchandise Carr had shipped to an unfamiliar recipient.

12. According to IHC managers, after becoming suspicious of Carr's activities, managers at IHC located a stack of boxes that Carr had prepared with shipping labels and placed in the shipping area for shipment. A manager collected the boxes and set them under a desk in the managers' office while he went to report what he had found to other managers. When he returned to the office, the manager found that the boxes he had placed under the desk had been removed.

13. Warehouse surveillance video captured Carr re-stocking the confiscated boxes to IHC's inventory. In the surveillance video, the shipping labels are removed.

14. A photograph of one of the shipping labels, taken by Carr's supervisor, shows Carr's name and home address as the sender. The recipient on the label is Kenny Webster in Norfolk, Massachusetts.

15. After terminating Carr's employment, IHC managers reviewed a history of the orders and shipments placed by Carr. They discovered that during the time Carr was responsible for placing orders, there was a significant increase in volume of orders of parts for CPAP[2] devices that was inconsistent with the number of CPAP part sold or returned during the same period of time. The managers also found that levels returned to normal following Carr's termination.

---

[2] CPAP (continuous positive airway pressure) is a machine often prescribed by medical providers to treat sleep-related breathing disorders. https://www.nhlbi.nih.gov/health/cpap.

16. IHC employees interviewed by SJPD said CARR's lifestyle appeared beyond his salary. They specifically described CARR as having high-end vehicles, various exotic animals as pets, and a large collection of expensive shoes.

***Carr's PayPal Account***

17. SJPD financial investigators determined that between January 1, 2014, and January 1, 2019, Carr's PayPal account ending in 3702 ("PayPal 3702") received $1,449,275.63 in payments for infant formula and CPAP masks.

18. The financial investigators found no evidence of Carr purchasing any infant formula or CPAP masks.

19. PayPal records show that nearly all of the 300 payments Carr received for formula and masks came from only two individuals, Webster and Ines Carolina Canhuati.

***SJPD Interview of Carr***

20. On June 19, 2022, SJPD investigators interviewed Carr after advising him of his Miranda Rights and explaining that he was not under arrest. Carr acknowledged he understood and agreed to the interview.

21. According to Carr, in about 2014, he began selling dented cans of infant formula on eBay to create extra income for himself. The cans of formula were part of IHC's inventory but could not be sold because they were damaged. Carr also admitted that he eventually began selling cases of undamaged cans of formula from IHC's inventory without authorization. Carr said Webster and Canhuati paid him about $30 to $40 for each case of infant formula he shipped to them.

22. In addition to infant formula, Carr admitted selling hundreds of IHC's CPAP masks to Webster. Carr said he intentionally ordered more infant formula and CPAP masks than needed. During business hours, he would put the over-ordered supplies in a box and label it to be shipped to Webster. Carr shipped an average of 4-6 boxes per day to Webster but claimed that he never told Webster that the supplies were stolen.

23. Carr told SJPD investigators that during the time he sold formula and CPAP masks, he had no other source of income other than the wages he earned from IHC and the money he received in exchange for the formula and masks.

24. Carr said that he used the proceeds from the sale of the stolen infant formula and CPAP masks to purchase a 2016 Toyota Camry and a 2019 Jaguar E Pace. He also said he paid for vacations and "buying stuff." Carr admitted that he did not pay taxes on his income from selling the infant formula and CPAP masks.

***Carr's PayPal Consisted of Nearly 100% Criminal Proceeds.***

25. An FBI forensic investigation of Carr's finances determined that from January 1, 2014, to October 1, 2019, Carr's PayPal 3702 account received $1,490,616 in payments for selling infant formula or CPAP masks including $1,345,016 from Webster and $145,600 from Canahuati.

26. During the same period, Carr used the funds in the PayPal 3702 account to make purchases of comic books, coins, and other collectibles ($271,408); reptiles, exotic pets, and pet supplies ($37,250); PayPal transaction fees ($44,066); and other miscellaneous expenses ($525,000).

27. During the same period, Carr also transferred approximately $587,828.13 in criminal proceeds from his PayPal 3702 account to three different personal bank accounts, including: $289,383.13 to his Mountain America Credit Union account ending in 4487 ("MACU 4487"); $207,305 to his JP Morgan Chase Bank account ending in 8922 ("JPMC 8922"); and $91,140 to his Bank of America account ending in 6734 ("BoA 6734").

***Vehicle Purchases with Funds Traceable to Criminal Proceeds***

28. During the same time that Carr was profiting from the sale of the supplies, his only income came from his employment with IHC. From January 1, 2014, to October 1, 2019, Carr received a total $110,202.21 in payroll deposits from IHC into MACU 4487.

29. Carr used proceeds from his fraud to purchase two vehicles in 2019.

30. In January 2019, Carr took delivery of a 2019 Jaguar E Pace which he purchased for $71,547.87. Carr paid $52,000 in cash and credits up front and financed the remaining amount of $19,547.87. The $52,000 cash payment consisted of funds traceable to criminal proceeds. Additionally, $8,435.18 of the payments Carr made to the auto loan, consisted of funds traceable to criminal proceeds.

31. In August 2019, Carr took delivery a 2016 Toyota Camry which he purchased for $20,017.84. Of the total amount Carr paid for this vehicle, $16,418.81 traced to criminal proceeds.

***$123,796.91 paid to the mortgage on Defendant Property traces to criminal proceeds.***

32. From January 2014 to approximately December 2019, Carr paid a total of $197,567.97 in mortgage payments to Dovenmuehle Mortgage, Nationstar, and Pacific Union

Financial from his MACU 4487 account. Carr also made a $5,000 mortgage payment to Pacific Union Financial from his BoA 6734 account.

33. To determine what portion of these mortgage payments were traceable to Carr's fraudulent conduct, investigators used the "Proceeds In, First Out" (PIFO) tracing method. Courts have recognized the use of such tracing methods to identify criminal proceeds. *See, e.g., United States v. Banco Cafetero Panama*, 797 F.2d 1154, 1159 (2d Cir. 1986) (approving the use of accounting methods including the first in, first out rule to trace criminal proceeds; government can choose which method to apply in its case). Under PIFO, the criminal proceeds deposited into the account are the first funds to leave the account. For example, if a bank account is opened using $100,000 in criminal proceeds and, afterward, $100,000 in funds from a legitimate source is deposited into the account, the PIFO method treats the first $100,000 of withdrawals as criminal proceeds leaving the account. After the first $100,000 is removed from the account, the next $100,000 withdrawn from the account is treated as legitimate funds leaving the account.

34. Applying PIFO, investigators determined that $118,796.91 of the $197,567.97 in mortgage payments, paid from the MACU 4487 account to Dovenmuehle Mortgage, Nationstar, and Pacific Union Financial, and all $5,000 of the $5,000 mortgage payment, paid from the BoA 6734 account to Pacific Unition Financial, consisted of funds traceable to criminal proceeds. Consequently, $123,796.91 of Carr's equity in Defendant Property's, plus any appreciation in value attributable to the proceeds, is subject to forfeiture.

*Grand Jury Indictment*

35. On December 13, 2023, the United States filed a grand jury indictment charging Carr with sixteen counts of Wire Fraud in violation of 18 U.S.C. § 1343 and one count of Money Laundering in violation of 18 U.S.C. § 1957 in case number 2:23-cr-455-HCN.

36. The Indictment notified Carr that the United States sought forfeiture of any property, real or personal, derived from proceeds traceable to his scheme to defraud including the two vehicles, the comic book collectibles, and Defendant Property.

37. On or about January 24, 2024, Carr failed to appear in court as required for an initial appearance and arraignment on the indictment. The Court issued an arrest warrant for Carr.

38. On January 30, 2024, federal law enforcement agents arrived at Defendant Property, the known residence of Carr, to execute the arrest warrant and previously issued seizure warrants for the vehicles. Upon making entry into the residence, agents found Carr to be deceased from an apparent self-inflicted gunshot wound.

**CAUSE OF ACTION**
18 U.S.C. § 981(a)(1)(C)
(Wire Fraud Forfeiture)

39. The United States incorporates by reference herein all allegations previously made.

40. Under 18 U.S.C. § 981(a)(l)(C), any property, real or personal, which constitutes or is derived from proceeds traceable to an offense constituting a "specified unlawful activity," or a conspiracy to commit such offense, is subject to forfeiture to the United States.

41. Under 18 U.S.C. §§ 1956(c)(7)(A) and 1961(1), wire fraud in violation of 18 U.S.C. § 1343 is a specified unlawful activity.

42. Title 18, United States Code, Section 1343, provides that:

> Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire . . . in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice shall be guilty of a crime.

43. As described above, the Defendant Property was involved in one or more violations of 18 U.S.C. § 1343 because approximately $123,796.91 in proceeds of Carr's Wire Fraud were used to pay mortgage payments on the Defendant Property. Therefore, at least $123,796.91, plus attributable appreciation, in the Defendant Property's equity is subject to forfeiture under 18 U.S.C. § 981(a)(1)(C).

## REQUEST FOR RELIEF

WHEREFORE, the United States respectfully asserts that the Defendant Property is forfeitable to the United States under 18 U.S.C. § 981(a)(l)(C).

The United States further requests:

A. That, pursuant to 18 U.S.C. § 985(c)(1)(B), notice of this complaint be posted on the Defendant Property.

B. That Notice of this action be given to the property owner and all persons known or thought to have an interest in or right against the Defendant Property;

C. That a Judgment of Forfeiture be decreed against the Defendant Property forfeiting all right, title, and interest in it to the United States;

D. That upon the issuance of a Judgment of Forfeiture, the United States Marshals Service or its delegate be able to dispose of the Defendant Property according to law; and

E. That the United States receives its costs of court and all further relief to which it is entitled.

Dated this 26th day of February 2024.

                    TRINA A. HIGGINS
                    United States Attorney

*/s/ Travis K. Elder*
TRAVIS K. ELDER
Assistant United States Attorney

## VERIFICATION

I, Special Agent Jack Marberger hereby verify and declare under penalty of perjury that I am a Special Agent with the Federal Bureau of Investigation, that I have read the foregoing Verified Complaint *In Rem* and verify under penalty of perjury pursuant to 28 U.S.C. § 1746 that the factual statements contained therein are true and correct to the best of my knowledge and belief.

Executed on this 23 day of February, 2024.

_____
Jack Marberger, Special Agent
Federal Bureau of Investigation